**Nos. 26-60180, 26-60181, 26-60194**

---

# In the United States Court of Appeals
# For the Fifth Circuit

---

SUNIL S. PATEL; LAURIE M. MCANALLY-PATEL,

*Petitioners-Appellants*,

v.

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee*.

---

On Appeal from the Decision of the United States Tax Court
in Docket Nos. 24344-17, 11352-18, 25268-18 (Jones, J.)

---

**AMERICAN FOREST & PAPER ASSOCIATION'S AMICUS BRIEF**
**IN SUPPORT OF NEITHER PARTY**

---

Kathleen Pakenham
Brie Barry
VINSON & ELKINS LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 237-0149
kpakenham@velaw.com
bbarry@velaw.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS

1. Number and style of case: Nos. 26-60180, 26-60181, 26-60194, *Patel v. Commissioner of Internal Revenue*;

2. The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Sunil S. Patel

Laurie M. McAnally-Patel

Magellan Insurance Company

Plymouth Insurance Company

Integrated Clinical Research, LLC

Strategic Clinical Research Group, LLC

Ophthalmology Specialists of Texas

Consovoy McCarthy PLLC

Cameron T. Norris

Ryan M. Proctor

Chamberlain, Hrdlicka, White, Williams & Aughtry

David D. Aughtry, Jr.

Patrick J. McCann, Jr.

Norah Bringer

Nicholas D. Doukas

Sheri S. Wilder

Emerald G. Smith

Kevin R. Oveisi

Alicia H. Eyler

David A. Hubbert

William M. Paul

Sebastian Voth

William D. Richard

Commissioner of Internal Revenue

American Forest & Paper Association

Vinson & Elkins LLP

Kathleen Pakenham

Brie Barry

Dated: September 21, 2026

*s/ Kathleen Pakenham*
*Counsel of Record*
*Amicus Curiae American Forest &*
*Paper Association*

## TABLE OF CONTENTS


**Page**

CERTIFICATE OF INTERESTED PERSONS ..... ii

TABLE OF AUTHORITIES ..... v

IDENTITY OF AMICUS CURIAE, STATEMENT OF INTEREST AND AUTHORITY TO FILE ..... 1

SUMMARY OF ARGUMENT ..... 2

ARGUMENT ..... 6

I. SECTION 7701(*o*) REQUIRES AN INDEPENDENT RELEVANCY DETERMINATION ..... 6

II. FOUR SETS OF JUDGES HAVE CONSTRUED THE RELEVANCY THRESHOLD AND PRODUCED FOUR IRRECONCILABLE STANDARDS, LEAVING THE LAW IN DISARRAY ..... 7

III. THE TAX COURT'S HISTORY-BASED STANDARD IS UNWORKABLE AND RAISES DUE PROCESS CONCERNS ..... 10

IV. THE CORRECT STANDARD: A TWO-PART THRESHOLD "RELEVANCY" TEST ..... 14

CONCLUSION ..... 20

CERTIFICATE OF COMPLIANCE ..... 21

CERTIFICATE REGARDING PRIVACY REDACTIONS AND VIRUS SCANNING ..... 22

CERTIFICATE OF SERVICE ..... 23

## TABLE OF AUTHORITIES

**Cases**

*Bank of New York Mellon Corp. v. Comm'r*,
801 F.3d 104 (2d Cir. 2015) .......... 17

*BMW of North Am., Inc. v. Gore*,
517 U.S. 559 (1996) .......... 13

*Coltec Indus., Inc. v. United States*,
454 F.3d 1340 (Fed. Cir. 2006) .......... 17

*Cottage Sav. Ass'n v. Comm'r*,
499 U.S. 554 (1991) .......... 7, 15

*Duncan v. Walker*,
533 U.S. 167 (2001) .......... 8

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 14

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) .......... 13

*Frank Lyon Co. v. United States*,
435 U.S. 561 (1978) .......... 11, 15

*Gregory v. Helvering*,
293 U.S. 465 (1935) .......... 14, 15

*Johnson v. United States*,
576 U.S. 591 (2015) .......... 10

*Knetsch v. United States*,
364 U.S. 361 (1960) .......... 11, 15

*Liberty Glob., Inc. v. United States*,
174 F.4th 1208 (10th Cir. 2026) .......... 8, 9, 10, 18

*Liberty Glob., Inc. v. United States*,
No. 1:20-cv-03501-RBJ, 2023 WL 8062792 (D. Colo. Oct. 31, 2023) .......... 8

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 18

*O'Gilvie v. United States*,
519 U.S. 79 (1996) .......... 17

*Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972) .......... 20

*Patel v. Comm'r*,
165 T.C. 171 (2025) .................................................................. 4, 5, 6, 7, 9

*Polselli v. IRS*,
598 U.S. 432 (2023) .......................................................................................8

*United States v. Consumer Life Ins. Co.*,
430 U.S. 725 (1977) ................................................................................7, 15

*United States v. Wulff*,
758 F.2d 1121 (6th Cir. 1985)...................................................................13

*Vidal v. Elster*,
602 U.S. 286 (2024) ......................................................................................11

**Statutes**

26 U.S.C. § 1001(a) .........................................................................................15

26 U.S.C. § 163(a) ...........................................................................................15

26 U.S.C. § 6662(a) .........................................................................................12

26 U.S.C. § 6662(b)(6)........................................................................ 2, 4, 12, 17

26 U.S.C. § 6662(i) .............................................................................. 2, 4, 13

26 U.S.C. § 6664(c)(2).....................................................................................13

26 U.S.C. § 7701(*o*) ......................................... 1, 2, 3, 4, 5, 6, 7, 10, 11, 16, 18, 19

26 U.S.C. § 7701(*o*)(1).................................................................................4, 6

26 U.S.C. § 7701(*o*)(1)(A) ............................................................... 6, 18, 19

26 U.S.C. § 7701(*o*)(1)(B) ............................................................... 6, 18, 19

26 U.S.C. § 7701(*o*)(5)(C) ............................................... 4, 6, 7, 8, 9, 16, 17

26 U.S.C. § 831(b) ..............................................................................................2

**Other Authorities**

Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) ..........................................................................8

H.R. Rep. No. 111-443(I) (2010)..................................................... 3, 7, 17

James S. Halpern, *Putting the Cart before the Horse: Determining Economic Substance Independent of the Language of the Code*, 30 VA. TAX REV. 327, 332 (2010)...............................................................................................12

## IDENTITY OF AMICUS CURIAE, STATEMENT OF INTEREST AND AUTHORITY TO FILE[1]

The American Forest & Paper Association ("***AF&PA***") serves to advance public policies that foster economic growth, job creation and global competitiveness for a vital sector that makes the essential paper and packaging products Americans use every day. The U.S. forest products industry employs more than 925,000 people, largely in rural America, and is among the top 10 manufacturing sector employers in 44 states. The industry accounts for approximately 4.7% of the total U.S. manufacturing GDP, manufacturing more than $435 billion in products annually. No parent corporation or publicly held company has a 10% or greater ownership interest in AF&PA.

AF&PA is interested in the issues presented in this case because its member companies routinely make choices regarding how they structure their enterprises and conduct transactions, many of which have tax implications. The U.S. Tax Court correctly held that section 7701(*o*)[2] requires a threshold relevance determination. But the "test" it fashioned for how to determine relevance is unworkable at best.

[1] No party's counsel authored this brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparation or submitting the brief; and no person—other than amicus curiae, its members, or its counsel—contributed money that was intended to fund preparation or submitting the brief. All parties have consented to the filing of this brief.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. ("***Code***"), in effect at all relevant times.

Courts, the Internal Revenue Service ("***IRS***"), and taxpayers need a comprehensible legal standard that remains true to the text of the statute. Counsel for AF&PA has authorized the undersigned to file this brief on its behalf.

## SUMMARY OF ARGUMENT

The U.S. Tax Court denied appellants' federal income tax deduction for what the appellants argued were premiums paid to microcaptive insurance companies. The Tax Court denied these deductions because appellants could not establish that the microcaptive arrangement giving rise to the claimed deductions was "insurance" under section 831(b). The Tax Court then separately held that appellants were liable for penalties under section 6662(b)(6) and (i) because the microcaptive transactions did not meet the two-prong test of the economic substance doctrine, which it determined to be relevant under section 7701(*o*)(1). This brief addresses the economic substance doctrine. As pertinent here, the Tax Court evaluated when a court should consider the economic substance doctrine. It correctly concluded that the economic substance doctrine is not "relevant" (as that term is used in section 7701(*o*)(1)) in every case, but it did not provide a workable framework for determining relevance.

This case presents this Court's first opportunity to interpret section 7701(*o*)(1), a provision of the Internal Revenue Code with widespread importance. To the extent this Court reaches the economic substance doctrine issues here, amicus

urges the Court to affirm the Tax Court's decision that the economic substance doctrine is not relevant in all cases and to provide greater clarity on how relevance is determined. Below amicus AF&PA proposes an analytical framework for the Court's consideration.

It is, of course, important to understand what the economic substance doctrine is, and equally important to understand what it is not. The economic substance doctrine is a canon of statutory construction. It is not a general anti-abuse rule. Historically, courts applied the canon to interpret the meaning of statutes that condition tax benefits on economic reality. While courts diverged on how the doctrine was applied—some adopting a "conjunctive" test with others applying a "disjunctive" test, *see* H.R. Rep. No. 111-443(I), at 293 (2010)—it was never utilized as a general anti-abuse rule that allowed the IRS or courts to disallow tax benefits that flowed from statutory text. Rather, as a canon of statutory construction, it was properly invoked only when the plain meaning of the statute was unclear, and where a transaction otherwise met all the elements found in the text of a Code provision that expressly or implicitly conditions a tax benefit on a change in economic reality.

In 2010 Congress enacted section 7701(*o*) to clarify the common law economic substance doctrine and to make clear that, for federal tax purposes, the conjunctive test developed by certain courts controlled. In clarifying the doctrine,

however, Congress did not transform it into a free-roaming anti-abuse tool; rather, the doctrine was placed in the definitions section of the Code, primarily to provide clarity on when the related strict liability penalty under section 6662(b)(6) and (i) could be imposed, and instructed taxpayers, the IRS, and courts to look to the existing caselaw in determining when the doctrine is "relevant." § 7701(*o*)(5)(C). By clarifying the economic substance doctrine in the Code through these means, Congress preserved the doctrine as a canon of statutory construction.

Yet, in the years since its enactment, the IRS has attempted to wield section 7701(*o*) as a general anti-abuse rule, invoking it where it is not relevant and seeking strict liability penalties against taxpayers whose tax positions comply with the letter and spirit of the law. Amicus respectfully urges the Court to restore the statute to its intended role and confirm that the economic substance doctrine is, and always has been, a canon of statutory construction that is only applied when the text of the statute giving rise to the claimed tax benefit compels it.

*First*, the Court should sustain the Tax Court's holding that the statute requires a threshold relevance determination. Its text provides "in no uncertain terms" that it applies only to "transaction[s] to which the economic substance doctrine is relevant." *See Patel v. Comm'r*, 165 T.C. 171, 187–88 (2025) (citing section 7701(*o*)(1)). Congress instructed that such determination "shall be made in the same manner as if this subsection had never been enacted." § 7701(*o*)(5)(C). Relying on these plain

terms, the Tax Court "easily conclude[d] that the statute requires a relevancy determination." *Patel*, 165 T.C. at 188. The Court should uphold this aspect of the Tax Court's decision.

*Second*, the Court should reject the methodology the Tax Court used to determine relevance. The Tax Court looked to history and whether courts applied the doctrine to transactions of the same type to determine whether the doctrine was relevant. But this is entirely inconsistent with the way in which courts applied the economic substance doctrine before section 7701(*o*) was enacted. That is, the relevance inquiry is not, and never has been, dependent on transaction types or asset classes. Instead, it hinges on the text of the specific provision on which the taxpayer relies for the transaction at issue.

*Finally*, the Court should adopt a workable standard that properly limits the application of the economic substance doctrine. Amicus offers the following framework:

*Step 1*: Determine whether the taxpayer has satisfied the elements of the Internal Revenue Code section on which the taxpayer relies for its claimed tax benefit. If the taxpayer has not established all elements of the Code section on which it relies, then the claimed tax treatment fails on the Code's plain terms, and the doctrine is categorically inapplicable, ending the relevance inquiry.

*Step 2*: Does the section at issue, by its text or structural design, incorporate an economic term or condition, explicitly or implicitly, that makes the tax benefit depend on economic reality? If not, the doctrine is irrelevant and the relevance inquiry ends. If so, the Court may proceed to the two-part economic substance test in section 7701(*o*)(1)(A) and (B).

The analytical framework above reflects the best meaning of section 7701(*o*) and gives effect to every word in the statute. It also ensures that the economic substance doctrine only applies to transactions to which it is relevant, providing necessary limits on an otherwise limitless strict liability regime and allowing taxpayers to reliably predict when the doctrine applies.

## ARGUMENT

### I. SECTION 7701(*o*) REQUIRES AN INDEPENDENT RELEVANCY DETERMINATION

There should be no serious debate about whether the economic substance doctrine is subject to a threshold relevancy inquiry. The text of section 7701(*o*) confirms "in no uncertain terms" that the statute applies only to "transaction[s] to which the economic substance doctrine is relevant." *See Patel*, 165 T.C. at 188 (citing section 7701(*o*)(1)). Congress provided guidance for how to make that determination: "The determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted." § 7701(*o*)(5)(C). Reading these provisions together, the Tax

Court "easily conclude[d] that the statute requires a relevancy determination." *Patel*, 165 T.C. at 188. This Court should do the same.

Congress was clear that it was clarifying the law, not changing it. In fact, Congress titled the section "CLARIFICATION OF THE ECONOMIC SUBSTANCE DOCTRINE." The legislative history bears out this reading. As the House report states, Congress only sought to "provide greater clarity and uniformity" by enacting section 7701(*o*). H.R. Rep. No. 111-443(I), at 295. It did not intend to "change current law standards in determining when to utilize an economic substance analysis." *Id.* at 296. Before the statute was enacted, courts did not apply the doctrine to every tax position; instead, courts first asked whether the statute giving rise to the claimed tax benefit contained language that conditioned the benefit on economic reality. *See, e.g.*, *Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554, 562–63 (1991) (declining to apply economic substance doctrine); *United States v. Consumer Life Ins. Co.*, 430 U.S. 725, 740–41 (1977) (same). Section 7701(*o*)(5)(C) preserved that framework.

## II. FOUR SETS OF JUDGES HAVE CONSTRUED THE RELEVANCY THRESHOLD AND PRODUCED FOUR IRRECONCILABLE STANDARDS, LEAVING THE LAW IN DISARRAY

Should this Court reach the question of the economic substance doctrine, it will be its first consideration of section 7701(*o*)(1). Thus far, the courts have not interpreted the statute uniformly, leaving the law in disarray. Two federal courts

have read the relevance threshold out of the statute altogether. The district court in *Liberty Global* collapsed the relevancy inquiry into the two-part economic substance test, holding that the doctrine is "relevant" whenever a transaction lacks economic substance. *Liberty Glob., Inc. v. United States*, No. 1:20-cv-03501-RBJ, 2023 WL 8062792, at *4–5 (D. Colo. Oct. 31, 2023) (proceeding "[a]t the risk of tautology"). Said differently, if a transaction fails the two-part economic substance test the doctrine is relevant, and if it passes it is not relevant. Under that approach, the threshold performs no independent work. The conditional clause in the statute becomes a grammatical appendage rather than a substantive limitation. But Congress does not enact statutory predicates to serve decorative purposes. *See, e.g.*, Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012); *Polselli v. IRS*, 598 U.S. 432, 441 (2023); *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

The Tenth Circuit took a different route to the same result, dismissing the relevancy threshold as "a red herring" and holding that the doctrine applies whenever a taxpayer seeks "a benefit not intended by Congress." *Liberty Glob., Inc. v. United States*, 174 F.4th 1208, 1213 n.6 (10th Cir. 2026). That approach effectively reads section 7701(*o*)(5)(C) out of the statute altogether, transforming the doctrine into a general anti-abuse rule that centers on nontextual congressional purpose. Supplanting that carefully calibrated legislative design with an open-ended judicial

inquiry is incompatible with the textualist principles that govern statutory construction and the basic requirement that tax laws provide predictable rules of general application.

The Tax Court took a different course, and the first part of its analysis was correct. It held that relevance is a distinct question, to be answered before the two-part economic substance test comes into play. *Patel*, 165 T.C. at 188. But to answer that question it looked to litigation history rather than the statute before it. Specifically, the Tax Court asked whether courts had previously applied the doctrine to transactions of the same type, treating section 7701(*o*)(5)(C)'s command that relevance be determined as if the subsection "had never been enacted" as a direction to consult pre-enactment caselaw instead of the underlying statute. Because prior cases had applied the doctrine to insurance arrangements, the Tax Court held the doctrine was relevant. But whether a transaction resembles one that has been litigated turns on the happenstance of prior enforcement and litigation choices rather than on what Congress enacted.

A fourth reading comes from Judge Eid's dissent in *Liberty Global*. Under her framework (the correct one) "the doctrine acts as a substantive canon to interpret statutory terms that involve an economic condition," and is relevant only when the operative statutory language, explicitly or implicitly, incorporates a term or concept that conditions the tax benefit on economic reality. 174 F.4th at 1228 (Eid, J.,

dissenting) (citation omitted). Relevance therefore turns on the provision the taxpayer invokes.

In the time since section 7701(*o*) was enacted four sets of judges have construed the same fourteen words and reached four mutually incompatible results. This fragmentation alone warrants this Court's careful consideration, but the stakes are heightened by the strict liability penalty consequences that attach. This doctrinal disarray is precisely the "pervasive disagreement about the nature of the inquiry" that raises serious constitutional concerns. *See Johnson v. United States*, 576 U.S. 591, 601 (2015). If experienced federal judges applying the same statutory language cannot converge on a common methodology, taxpayers cannot be expected to divine the answer. The Fifth Circuit should adopt a durable framework so that taxpayers, the government, and the courts can apply section 7701(*o*) with the predictability and uniformity that Congress intended.

## III. THE TAX COURT'S HISTORY-BASED STANDARD IS UNWORKABLE AND RAISES DUE PROCESS CONCERNS

The Tax Court's transaction-type inquiry has no guardrails. For example, on the coattails of the Tax Court's decision below, the government recently argued in another case before the Tax Court that the economic substance doctrine is relevant to all transactions that "involve real estate, debt, and installment sales." *Harty v. Comm'r*, T.C. Dkt. No. 23354-21, Resp't's Pretrial Mem. 58, Doc. No. 314. To support this theory, it pointed to cases pre-dating section 7701(*o*) that applied the

doctrine to transactions involving those types of assets or financing arrangements, including *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), and *Knetsch v. United States*, 364 U.S. 361 (1960). That theory would sweep entire industries into a strict liability penalty regime on the strength of nothing more than the assets or financial characteristics involved.

But the relevance inquiry is premised on the text of the underlying statute and its specific provisions, not transaction types or asset classes. *Frank Lyon* turned on section 167's concept of "ownership," 435 U.S. at 580–83, and *Knetsch* on section 163(a)'s requirement of genuine "indebtedness," 364 U.S. at 365–66, not on the fact that one transaction involved real estate and the other involved debt. A methodology that sorts transactions by asset class or financing characteristics rather than by operative provision is inconsistent with what courts did before section 7701(*o*) was enacted.

The approach also breaks down the moment a previously unconsidered transaction is at stake. The Tax Court's methodology requires looking backwards to find a historical analogy, and it provides no way to analyze novel transactions or assets that courts have yet to consider. *See Vidal v. Elster*, 602 U.S. 286, 324 (2024) (Barrett, J., concurring) (explaining that a "laser-like focus" on history "misses the forest for the trees," and that courts eventually will encounter situations "without a historical analogue and be forced to articulate a test for analyzing it"). Under the

Tax Court's logic, the doctrine can never apply to new transactions or assets because no pre-clarification case addresses them. Courts could of course attempt to fit new transactions into the mold of historical ones, but that approach will inevitably produce inconsistent and unpredictable results. A relevance test that works in familiar territory but collapses outside of it is no legal standard at all.

Nor can the outcome be predicted in advance under this analysis. Whether transactions are of the same type is a subjective judgment call that can only be made after the fact. If the Tax Court's approach is left standing, taxpayers will have no way of knowing whether their individual transactions will withstand scrutiny. Instead, this Court should adopt a workable, text-based standard that can be applied prospectively. *See* James S. Halpern, *Putting the Cart before the Horse: Determining Economic Substance Independent of the Language of the Code*, 30 VA. TAX REV. 327, 332 (2010) ("[T]he focus must be a purposive reading of the particular portion of the Code in question and not the merits of the transaction in the abstract.").

These are constitutional, not simply practical, problems. When the economic substance doctrine applies, a strict liability penalty—one of only a handful in the tax code—applies. Section 6662(a) and (b)(6) imposes a 20% accuracy-related penalty on underpayments of tax attributable to any disallowance of claimed tax benefits by reason of a transaction that is devoid of economic substance. That penalty is

increased to 40% if the taxpayer did not adequately disclose the transaction to the IRS. § 6662(i). No reasonable cause and good faith defense is available to the taxpayer. § 6664(c)(2).

A penalty that forecloses a reasonable cause and good faith defense demands precise criteria for when it applies. Indeed, such a statute may offend Fifth Amendment due process if it does not require the government to prove any degree of scienter. *See United States v. Wulff*, 758 F.2d 1121, 1124–25 (6th Cir. 1985). That is the case with the penalty regime here. Taxpayers also need fair notice of both the conduct that may subject them to a penalty and the severity of that penalty. *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). A relevance standard that turns on after-the-fact judgments about transaction types supplies neither. It opens the door to imposition of the strict liability penalty on any taxpayer that engages in a transaction the IRS does not like. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (reasoning a statute "so standardless that it authorizes or encourages seriously discriminatory enforcement" violates due process (citation omitted)).

These concerns are avoidable. Of the four readings described above, only Judge Eid's canon of construction standard gives taxpayers a before-the-fact, text-based basis for prediction. Where a statute is susceptible of competing constructions, this Court should adopt the one that avoids serious constitutional

doubt. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 565 (2009) (Breyer, J., dissenting) (explaining the canon of constitutional avoidance).

## IV. THE CORRECT STANDARD: A TWO-PART THRESHOLD "RELEVANCY" TEST

Once it is determined that section 7701(*o*)(1) requires a threshold relevance inquiry (*see* Point II, *supra*), the question becomes how to determine whether the economic substance doctrine is relevant in a given case. As discussed below, a two-part inquiry is the proper analytical frame work: *First*, whether the Code provision the taxpayer invokes would afford the claimed benefit on its own terms. *Second*, if it would, whether that Code provision conditions the benefit on economic reality. Only when both answers are "yes" does the doctrine have any role to play. This analysis is consistent with the Supreme Court's development of the doctrine, avoids Due Process concerns, and respects the constitutionally-required separate roles of Congress as the drafter of statutes and the courts as interpreters of statutes.

We start with the bedrock principle that the doctrine is a canon of statutory construction. From its inception, the doctrine has been a means of discerning what a statute requires, not a license to override statutory text. In *Gregory v. Helvering*, the Supreme Court framed the inquiry as "whether what was done, apart from the tax motive, was the thing *which the statute intended*." 293 U.S. 465, 469 (1935) (emphasis added). In other words, its purpose is to discern the meaning of the statute giving rise to the claimed tax benefit.

That interpretive premise is not confined to *Gregory*. The Supreme Court's later decisions show a consistent pattern. When the operative provision incorporates a concept that depends on economic reality, the Court applies the doctrine; when it does not, the Court declines to do so. In *Knetsch*, section 163(a)'s allowance of interest deductions for "indebtedness" presupposed genuine indebtedness, an inherently economic concept, and the doctrine was relevant. 364 U.S. at 365–66. In *Frank Lyon*, section 167's depreciation allowance for "ownership" likewise required examination of whether the taxpayer bore the economic incidents of ownership. 435 U.S. at 580–83.

The converse is equally instructive. In *Consumer Life Insurance Co.*, the reserve-computation provisions at issue did not incorporate a term requiring economic-reality analysis (the government had attempted to read a nontextual "risk" requirement into the statute), and the Court declined (over the government's invitation) to subject the disputed transaction to economic-substance scrutiny. 430 U.S. at 740–41. Similarly, in *Cottage Savings*, the Court read section 1001(a)'s requirement of a "materially different" exchange as referring to legal entitlements, not economic outcomes, thereby declining to apply the doctrine. 499 U.S. at 562–63.

That pattern supplies the governing principle: the doctrine is relevant when the statutory text makes economic reality part of the condition for the claimed tax

benefit. It is not relevant merely because a transaction is tax-driven, unfamiliar, or resembles one to which a court previously applied the doctrine. Section 7701(*o*)(5)(C) should be read against that background, yielding a threshold with two analytical steps. *First*, whether the Code provision the taxpayer invokes would afford the claimed benefit on its own terms. *Second*, if it would, whether that Code provision conditions the benefit on economic reality. Only when both answers are "yes" does the doctrine have any role to play.

The first question is whether the taxpayer has established all the elements of the Code provision on which the taxpayer relies for the tax benefit at issue. If the taxpayer has not, then the claimed benefit fails on the statute's plain terms, the doctrine is categorically inapplicable, and the inquiry ends. While a canon of construction aids in understanding statutory text, it does not supply an independent ground for disallowance once a blackletter application of the provision at issue already has resolved the matter.

Before section 7701(*o*) was enacted, courts that found a taxpayer had failed to demonstrate its entitlement to a tax benefit under the plain language of the applicable Code provision simply disallowed the claimed benefit on that basis alone, without resort to the economic substance doctrine. The doctrine is a "common law rule that allows courts to question the validity of a transaction and deny taxpayers benefits *to which they are technically entitled* under the Code." *Bank of New York*

*Mellon Corp. v. Comm'r*, 801 F.3d 104, 113 (2d Cir. 2015) (emphasis added). If the taxpayer is not technically entitled to the benefit, there is nothing for the doctrine to disallow because the statute already has supplied the answer. *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1351 (Fed. Cir. 2006) (applying the doctrine only after determining that the transaction fell "within the literal terms of the statute").

The related penalty provision points to the same conclusion. Section 6662(b)(6) reaches an underpayment "by reason of" a transaction lacking economic substance, and "by reason of" is a term of causation: it means "because of." *See O'Gilvie v. United States*, 519 U.S. 79, 83 (1996). Where the disallowance rests on a failure to satisfy the elements of the operative provision, the underpayment is caused by that noncompliance, not by any lack of economic substance, and the causal link section 6662(b)(6) requires is therefore absent.

Congress preserved this sequencing. Section 7701(*o*)(5)(C) commands that the relevance determination "shall be made in the same manner as if this subsection had never been enacted," and the legislative history confirms that "the provision does not change current law standards in determining when to utilize an economic substance analysis." H.R. Rep. No. 111-443(I), at 295–96. Because the doctrine was not used before statutory clarification as a secondary ground for tax benefit disallowance, extending it to cases in which it is unnecessary to disallow the benefit would change its historical application rather than preserve it.

If the taxpayer demonstrates that it is entitled to the claimed tax benefit under the plain meaning of the Code, then the second question is whether that provision, by its text or structural design, incorporates an economic term or condition, explicitly or implicitly, that makes the tax benefit depend on economic reality. If not, the doctrine is irrelevant and the inquiry should stop. If so, the court may proceed to the two-part test in section 7701(*o*)(1)(A) and (B). The two-part test is not the threshold itself. Instead, it is the merits inquiry that follows a threshold showing of relevance. Congress clarified the test by enacting section 7701(*o*) but it did not transform it into a general anti-abuse rule.

The question is always what the operative provision requires. Abandoning the threshold "effectively hand[s] the government a blank check." *Liberty Glob.*, 174 F.4th at 1227 (Eid, J., dissenting). The threshold prevents that result by keeping the doctrine tied to the text Congress enacted and respects the separation of powers. It confines courts to interpreting and applying the statute instead of authorizing them to disallow a result because it seems inconsistent with an amorphous conception of congressional purpose. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401 (2024). Section 7701(*o*)'s placement in the definitions part of the Code confirms that Congress enacted definitional guidelines, not a general anti-abuse rule. That is also the answer to the IRS's categorical asset-class theory, which would make the

doctrine relevant whenever a transaction involves an asset class or financing characteristic to which the doctrine has previously been applied.

In practice the framework proposed herein is easily applied: Identify the Code provision on which the taxpayer relies for a tax benefit; determine whether the taxpayer has established the elements of the Code provision; ask whether its text or structural design conditions the benefit on a nontax business purpose and meaningful nontax economic consequences; and, if it does, apply the two-part economic substance test in section 7701(*o*)(1)(A) and (B), concluding that the transaction fails if the provision's requirements are unsatisfied. Each step keeps the court's attention on the operative statute, preserves the independent work of the word "relevant" in section 7701(*o*), and prevents the merits test from swallowing the threshold.

Under this framing, the threshold does what the alternatives cannot. It is provision-specific and text-driven. It asks what the operative statute requires, not whether an asset class or transaction type has appeared in earlier cases. It remains administrable when the transaction is novel, because the court construes the statute first and applies the doctrine only if the statute makes economic substance a relevant condition. And it supplies taxpayers with before-the-fact notice, something that a categorical or history-driven approach cannot. Taxpayers can identify the provision that supplies their claimed benefit and ask whether its text turns on economic reality. In sum, amicus asks this Court to do what neither the Tenth Circuit nor the Tax Court

has done: allow taxpayers "to be informed as to what the State commands or forbids," *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972), by providing a standard that permits them to understand the tax consequences of their actions and plan their affairs accordingly.

## CONCLUSION

Amicus respectfully requests that the Court (1) sustain the Tax Court's decision insofar as it confirms that a threshold relevance inquiry exists, (2) reject the Tax Court's relevance determination methodology, and (3) adopt the framework proposed herein to evaluate whether the economic substance doctrine is relevant.

Dated: September 21, 2026

*s/ Kathleen Pakenham*
Kathleen Pakenham
Brie Barry
VINSON & ELKINS LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 237-0149
kpakenham@velaw.com
bbarry@velaw.com
*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), it contains 5,668 words.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 14-point Times New Roman font.

Dated: September 21, 2026

*s/ Kathleen Pakenham*

Kathleen Pakenham
VINSON & ELKINS LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 237-0149
kpakenham@velaw.com
*Counsel for Amicus Curiae*

**CERTIFICATE REGARDING PRIVACY REDACTIONS**
**AND VIRUS SCANNING**

I certify that (1) all required privacy redactions have been made in compliance with 5TH CIR. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, in compliance with 5TH CIR. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: September 21, 2026

*s/ Kathleen Pakenham*
Kathleen Pakenham
VINSON & ELKINS LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 237-0149
kpakenham@velaw.com
*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 21, 2026

*s/ Kathleen Pakenham*
Kathleen Pakenham
VINSON & ELKINS LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 237-0149
kpakenham@velaw.com
*Counsel for Amicus Curiae*